UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| THE ROW, INC. | ) |
|       Plaintiff, | ) |
| v. | ) No. 3:16-cv-00687 |
| | ) Chief Judge Crenshaw |
| ROOKE, LLC, | ) |
|       Defendant. | ) |

## MEMORANDUM OPINION

Pending before the Court in this trademark infringement action is Rooke, LLC's ("Rooke") Motion for Summary Judgment (Doc. No. 39), to which The Row, Inc. ("The Row") has responded in opposition (Doc. No. 46), and Rooke has replied (Doc. No. 53). For the reasons that follow, the Motion will be granted and judgment will entered in favor of Rooke.

### I. Factual Background

The Statement of Undisputed Material Facts, Additional Statement of Facts, and Responses thereto (Doc. Nos. 41, 48 & 54) reveal the following facts:

Rooke owns and operates a chain of restaurants called "Dierks Bentley's Whiskey Row" ("Whiskey Row"). Prior to the date on which the first "Whiskey Row" restaurant opened for formal business, Rooke advertised and promoted the restaurant name in commerce in connection with the offering of bar and restaurant services. (Doc. No. 41 at 1).

Rooke filed its application for federal trademark registration of the word mark "Whiskey Row" on September 21, 2011, and submitted to the United States Patent and Trademark Office ("USPTO") a specimen identifying Rooke's use of the mark in commerce through advertisement and promotion of Rooke's restaurant and bar services. Subsequently, the USPTO issued a certificate

of registration. (Id. at 2). The trademark registration is for the words "Whiskey Row" in standard font. Typically, Rooke displays the mark and advertises its restaurant as "Dierks Bentley's Whiskey Row." (Id.).

On November 29, 2012, The Row filed an application on an "intent-to-use" basis for a design mark consisting of the words "Genuine Food and Drink The Row Kitchen and Pub." The USPTO granted Plaintiff's trademark application and registered its mark on the principal register. That registration is for a colored design logo. The Row was not awarded a trademark registration for the singular word "row." (Id. at 3).

Up until the last paragraph, The Row agrees with Rooke's recitation of the facts. It adds, however, that while Rooke represented to the USPTO that its Whiskey Row mark was first used in commerce on September 15, 2011, the first Whiskey Row restaurant did not open until July 4, 2013 in Scottsdale, Arizona. (Doc. No. 48 at 5). In fact, in a December 19, 2011 response to an Office Action by the USPTO, Rooke submitted a specimen described as a "website image of mark for services" and verified that "[t]he Applicant is using the mark in commerce, . . . in connection with the identified . . . services" and that the specimen "was . . . in use in commerce at least as early as the filing date of the application." (Id. at 6). That specimen also contained an address and the notation "COMING SOON." (Id. at 8). In a second response dated December 29, 2011, to the same Office Action, Rooke again stated that the mark was being used in commerce, but the notation "COMING SOON" was deleted. (Id.).

As for its own mark, The Row contends that "[t]he literal element of the mark The Row applied to register consisted of 'Genuine Food and Drink The Row Kitchen & Pub' and the word THE in stylized cursive red letters with gold borders and the word ROW in capital block red letters

2

with gold borders and red shading, bordered on the top with the words GENUINE FOOD AND DRINK in dark red block capital letters with gold borders and on the bottom with the words KITCHEN & PUB in red block capital letters with gold borders. with gold borders." (Id. at 3). It also points to registration number 4,511,836 issued to The Row by the USPTO for the following:

> THE COLOR(S) RED AND GOLD IS/ARE CLAIMED AS A FEATURE OF THE MARK. THE MARK CONSISTS OF THE WORD "THE" IN STYLIZED CURSIVE RED LETTERS WITH GOLD BORDERS AND THE WORD "ROW" IN CAPITAL BLOCK RED LETTERS WITH GOLD BORDERS AND RED SHADING, BORDERED ON THE TOP WITH THE WORDS "GENUINE FOOD AND DRINK" IN DARK RED BLOCK CAPITAL LETTERS WITH GOLD BORDERS AND ON THE BOTTOM WITH THE WORDS "KITCHEN & PUB" IN RED BLOCK CAPITAL LETTERS WITH GOLD BORDERS.

(Id. at 13).

The Row opened its restaurant under the named Genuine Food and Drink – The Row – Kitchen and Pub on Lyle Avenue in Nashville, Tennessee on March 9, 2013. Since then, The Row, Inc. has earned more than $16,000,000 from the sale of over 850,000 meals. In addition to locals and tourists, customers have come from all 50 states and 15 foreign countries. (Id. at 12). The Row also claims that its restaurant has been reviewed on the Trip Advisor website by more than 2,300 patrons, and it is ranked within the top two percent of Nashville restaurants[1] rated on that site. The Row claims to have a presence not only on Trip Advisor, but also on internet sites such as Open Table, Yelp, Facebook, Four Square, Urban Spoon and Twitter. (Id. at 11).

In addition to its restaurant and catering business, The Row sells a wide range of merchandise containing its mark, ranging from t-shirts to koozies to beer glass to wristbands. That

---

[1] In its Additional Statement of Facts, The Row stated that its restaurant was rated on Trip Advisor in the top two percent of restaurants nationwide. (Id. at 11). In a subsequent declaration, however, Kelley Black, its President, indicated this was in error, and that the rating related to restaurants in Nashville. (Doc. No. 52-1 at 1).

merchandise is sold both at the restaurant and online through The Row's website.

The Row's mark has also been used in magazine advertisements and dining guides, as well as on gift cards, concierge cards, and the like. The mark has also been used in marketing directed at local and regional residents, as well as tourists. It has also been used in advertisements and promotions on cable television and radio stations.

Although The Row presently has only the restaurant in Nashville, it claims to be "studying plans to advertise, promote, market, display, distribute, offer for sale and sell its services in Huntsville, Alabama; Atlanta, Georgia; Austin, Texas and Gatlinburg, Tennessee." (Id. at 7). It is also studying the possibility of advertising in a regionally distributed magazine available on Southwest Air routes to and from Nashville, Boston, New York and Chicago.

## II. Summary Judgment Standards

The standards governing summary judgment have been set forth in countless opinions and should be well understood. For present purposes, it suffices to note: (1) summary judgment is only appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a); (2) the facts and inferences must be construed in favor of the nonmoving party, Van Gorder v. Grand Trunk W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007); (3) the Court does not weigh the evidence, or judge the credibility of witnesses when ruling on the motion, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); and (4) the mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment, Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).

## III. Application of Law

The Row alleges that Rooke infringed on its trademark in violation of the Lanham Act, 15

4

U.S.C. § 1114(b). It also requests that the Whiskey Row mark be cancelled as provided for in 15 U.S.C. § 1119. Prior to reaching the substance of those claims, the Court addresses a preliminary matter raised by the parties.

**A. Senior or Junior Mark**

The parties dispute which among them holds the senior mark and is therefore entitled to a presumption of validity. Under the Lanham Act, "[a] certificate of registration of a mark upon the principal register . . . shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate." 15 U.S.C. § 1057(b). Although a certificate is not dispositive and validity must be shown, "federal registration . . . entitles the [holder] to a 'strong presumption' that the mark is a protectable mark." Zobmondo Entm't, LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010). In other words, "[r]egistration of a mark on the Principal Register of the USPTO creates a rebuttable presumption that a trademark is valid, that is, either inherently distinctive or descriptive with secondary meaning, and therefore, protectable under federal trademark law." Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 502 F.3d 504, 513 (6th Cir. 2007).

The Row argues that the presumption based on registration should not apply in this case and that it should be deemed the senior user. This is because The Row opened its restaurant first, and Rooke misrepresented in both its verified application and in responses to an Office Action from the USPTO that the mark was being used in commerce in September 2011 when, in fact, the first Whiskey Row restaurant did not open until some 21 months after the application was filed. Rooke

insists it is the senior user because Whiskey Row was registered first, and argues "that it defies citation to authority" for the "so basic principle" that "a junior trademark user and applicant cannot sue a senior user for infringement based on the senior user's own trademark." (Doc. No. 53 at 2).

"Traditionally, ownership of a trademark accrues when goods bearing the mark are sold, displayed for sale or otherwise publicly distributed." Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc., 186 F.3d 311, 320 (3d Cir. 1999). Rooke argues this general rule is inapplicable because "[t]he Sixth Circuit has found that a genuine commercial transaction in connection with the rendering of services is only required when a trademark is not registered; otherwise, open use through advertising is sufficient to establish priority" (Doc. No. 53 at 3), and hence its advertising was sufficient to show use. It relies on Allard Ent. Inc. v. Advanced Programming Resources, Inc. 146 F.3d 350 (6th Cir. 1998) for this proposition.

Rooke is correct that the Sixth Circuit in Allard stated that "in the absence of federal registration, prior ownership of a mark is only established as of the first actual use of a mark in a genuine commercial transaction." Id. at 356. However, the court's concern in Allard was with both common law trademarks and trademarks under federal law. In fact, prior to making that statement, the Sixth Circuit noted that the Lanham Act was amended in 1988 and "redefined the term 'use in commerce' as 'the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a mark.'" Id. at 357 (quoting 15 U.S.C. § 1127). The amended Act goes on to provide that, with respect to services, "a mark shall be deemed in use in commerce . . . when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services." 15

U.S.C.A. § 1127.

Here, The Row has agreed to Rooke's Statement of Fact that "[p]rior to the date on which the first 'Whiskey Row' restaurant opened for formal business, Rooke advertised and promoted the restaurant name in commerce in connection with the offering of bar and restaurant services." (Doc. No. 47 at 1-2). This admission, however, hardly establishes that the advertising was "open and notorious" as Rooke claims, let alone the extent of the advertisement and promotion, or when that advertising and promotion began for purposes of determining whether Whiskey Row was "in use."

Ultimately, resolution of this issue does not matter because even if The Row is deemed the senior user, it has not established trademark infringement. And, because The Row cannot show trademark infringement, it lacks standing to seek cancellation of the Whiskey Row mark.

**B. Trademark Infringement**

"To state a claim for trademark infringement under the Lanham Act, a plaintiff must allege facts establishing that: (1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion." Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 609 (6th Cir. 2009). "[W]hether a claim is brought under § 1114 for infringement of a registered mark, or whether it is brought under § 1125(a) for infringement of an unregistered mark, the touchstone of the claim is 'likelihood of confusion.'" ETW Corp. v. Jireh Pub., Inc., 332 F.3d 915, 940 (6th Cir. 2003); see Kassa v. Detroit Metro Convention & Visitors Bureau, 672 F. App'x 575, 576 (6th Cir. Jan. 12, 2017) (stating that "[t]he third element is the "touchstone of liability"). Put somewhat differently, "the key question in cases where a plaintiff alleges trademark infringement and unfair competition is whether the defendant's actions create a likelihood of confusion as to the origin of the parties' goods or services." Bird v. Parsons, 289 F.3d 865, 877 (6th

7

Cir. 2002).

At first blush, one might readily conclude that there is no likelihood of confusion as to The Row's and Rooke's marks, which, respectively, are as follows:

                    WHISKEY ROW

However, "[i]n assessing the likelihood of confusion, a court's concern is 'the performance of the marks in the commercial context'" and "[t]he appearance of the litigated marks side by side in the courtroom does not accurately portray actual market conditions." Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc., 931 F.2d 1100, 1106 (6th Cir. 1991) (quoting Frisch's Rest., Inc. v. Shoney's Inc., 759 F.2d 1261, 1266 (6th Cir. 1985)).

Instead, the Sixth Circuit has "articulated eight factors for evaluating the "likelihood of confusion." Frisch's Rest., Inc., 759 F.2d at 1264. Those factors are "1. strength of the plaintiff's mark; 2. relatedness of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. likely degree of purchaser care; 7. defendant's intent in selecting the mark; [and] 8. likelihood of expansion of the product lines." Id.; accord Georgia-Pac. Consumer Prod. LP v. Four-U-Packaging, Inc., 701 F.3d 1093, 1100 (6th Cir. 2012) Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr., 109 F.3d 275, 280 (6th Cir. 1997). "These factors are helpful guides rather than rigid requirements," and "[t]o create a triable issue of fact, the plaintiff's 'burden is to identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue.'" Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc., 730 F.3d 494, 509 (6th Cir. 2013) (quoting Abercrombie & Fitch

Stores, Inc. v. Am. Eagle Outfitters, Inc., 280 F.3d 619, 646 (6th Cir. 2002)). The Row has failed to carry that burden.

**1. Strength of the Mark**

"The strength of a mark is a determination of the mark's distinctiveness and degree of recognition in the marketplace." Gray v. Meijer, Inc., 295 F.3d 641, 646 (6th Cir. 2002). "Marks fall on a 'spectrum' that ranges, in order of increasing strength, from '(1) generic or common descriptive and (2) merely descriptive to (3) suggestive and (4) arbitrary or fanciful.'" Grubbs v. Sheakley Grp., Inc., 807 F.3d 785, 795 (6th Cir. 2015) (quoting Champions Golf Club, Inc. v. The Champions Golf Club, Inc., 78 F.3d 1111, 1116–17 (6th Cir. 1996)).

The Row claims its mark is arbitrary or fanciful, making it entitled to the most protection. An arbitrary mark "has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached, such as CAMEL cigarettes or APPLE computers." Tumblebus Inc. v. Cranmer, 399 F.3d 754, 761 n. 6 (6th Cir.2005). A fanciful mark "is a combination of letters or symbols signifying nothing other than the product or service to which the mark has been assigned, such as EXXON or KODAK." Id. at 761 n. 7.

In arguing that its mark is arbitrary or fanciful, The Row points out that the Merriam-Webster Dictionary defines the noun "row" as "a number of objects in an unusually straight line – a *row* of bottles; also the line along which such object are arranged – planted the corn in parallel *rows* or a street or area or dominated by a specific kind of enterprise or occupancy – doctors' *row*." (Doc. No. 50 at 7). Such definitions, The Row argues, have "no recognized connection to the restaurant and catering services offered by The Row." (Id.).

No doubt, the phrase "The Row" is a prominent feature of the mark, given its central location and size. However, "[t]he unit of analysis in considering the strength of the mark is the entire mark, not just a portion of the mark." AutoZone, Inc. v. Tandy Corp., 373 F.3d 786, 795 (6th Cir. 2004). The Row's mark is bordered at the top with the phrase "Genuine Food and Drink," and below with the words "Kitchen Pub," either of which is a dead giveaway that The Row is a restaurant. In this sense, the mark is descriptive, and entitled to less weight than an arbitrary or fanciful mark.

Furthermore, The Row's suggestion that its mark is arbitrary or fanciful is undercut by the location of the restaurant. Nashville is home to country music and a beacon for aspiring country music artists, singer/songwriters, and fans. If, as it is sometimes said, the Ryman Auditorium is the Mother Church of Country Music, then Music Row lies within its parish, sitting as it does just southwest of downtown and serving as the home to many country music recording studios, publishers, record labels, and music rights licensing and management businesses. While APPLE suggests computers and EXXON suggests a gas station, in Nashville The Row seems as likely to conjure up images of Music Row as much as it does a restaurant.

The Row also argues that its mark is strong because a search of USTPO's registration database for restaurant services reveals only two registrations for marks including "The Row." (Doc. No. 50 at 10). Maybe so, but the challenge here is to the "Whiskey Row" mark, which does not contain the word "The." According to Rooke, when the database is searched for marks containing just "Row," there are 525 registrations and pending applications in goods and services, and 33 such uses or intended uses for restaurant and bar services. (Doc. No. 53 at 6) See, NetJets Inc. v. IntelliJet Grp., LLC, 678 F. App'x 343, 351 (6th Cir. 2017) (stating that

"IntelliJet was "a play on both 'intelligent' and 'jet'" but finding that the mark was "relatively weak, especially considering other federal registration of the term and additional third party uses of the same or similar terms").

Finally on the issue of strength, The Row claims that, since March 2013 it has had $16 million in sales, sold more than 850,000 meals, and been reviewed by more that 2,000 customers. Not being a restauranteur, these figures in the abstract are not particularly helpful to the Court. Although the numbers seem large, the Court has no way of knowing how much the mark was responsible for drawing patrons, as opposed to any of a number of variables, including location.

Based upon the record presented, the Court finds that, although "The Row" mark is entitled to protection because it is duly registered, it is not otherwise particularly strong.

**2. Relatedness of Goods**

The goods are virtually the same, if not identical. Both The Row and Whiskey Row are restaurants that also serve alcoholic beverages.

That said, "the issue is not whether the goods will be confused with each other, but rather whether the public will be confused as to their source." NetJets, Inc., 678 F. App'x at 352 (quoting Recot, Inc. v. M.C. Becton, 214 F.3d 1322, 1329 (Fed. Cir. 2000)). As Rooke points out, it operates restaurants in various cities, and "no consumer intending to visit [The Row's] restaurant in Nashville, TN would be confused and end up at Rooke's restaurant in Scottsdale, Arizona." (Doc. No. 53 at 10).

Even in Nashville there is unlikely to be great deal of confusion as to source. Not only is Whiskey Row located (or to be located) on Lower Broadway, miles away and in a different part

of town, The Row concedes that "Rooke typically displays the mark and advertises the name as 'Dierks Bentley's Whiskey Row.'" (Doc. No. 47 ¶5).[2]

Nevertheless, and because the goods are virtually identical, the Court finds this factor marginally favors The Row.

### 3. Similarity of the Marks

"The similarity of the marks 'is a factor of considerable weight[.]'" CFE Racing Prod., Inc. v. BMF Wheels, Inc., 793 F.3d 571, 592 (6th Cir. 2015). Again, consideration of this factor is not based upon a side-by-side comparison of the two marks. Instead, the appropriate test is "whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them[.]" Daddy's Junky Music Stores, 109 F.3d at 283. In other words, the question is whether "the appearance of the marks is similar enough that it may confuse customers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark." Jet, Inc. v. Sewage Aeration Sys., 165 F.3d 419, 423 (6th Cir. 1999); see, Progressive Distribution Servs., Inc. v. United Parcel Servs., Inc., 856 F.3d 416, 432 (6th Cir. 2017) (citation omitted) (stating that "a court must determine, in the light of what occurs in the marketplace, whether the mark 'will be confusing to the public when singly presented.'"). "In assessing similarity, a court should consider the 'pronunciation, appearance, and verbal translation of conflicting marks.'" Leelanau Wine Cellars, 502 F.3d at 516–17 (quoting AutoZone, Inc., 373 F.3d at 795–96).

---

[2] It is unclear from the record whether Whiskey Row has opened in Nashville, but the filings suggest that it has not. As for location, the filings indicate that the Whiskey Row restaurant will be located at the corner of Fourth and Broadway. (See, Doc. No. 40 at 16; Doc. No. 50 at 11).

Apart from the fact that both marks contain the word "Row" and are used for restaurants, it is unlikely that any customer would confuse the two. One driving down the street or strolling along the sidewalk and seeing "Whiskey Row" is hardly apt to think, "hey, look, 'The Row,'" or vice versa. One mark is multi-colored, the other monochrome. One mark is all in block letters, the other is in stylized font and includes cursive. One mark is a single straight line containing but two words, while the other contains writing, both above and below its most prominent feature.

In asserting similarity, The Row focuses on the fact that both marks contain the word "Row." However, The Row has pointed to no authority which suggest that it can co-opt the word "Row," anymore than Rooke can co-opt that word or "Whiskey."

Regardless, "a detailed analysis of specific features of a trademark is not appropriate; rather, 'courts must view marks in their entirety and focus on their overall impressions, not individual features.'" Therma-Scan, Inc. v. Thermoscan, Inc., 295 F.3d 623, 633 (6th Cir. 2002) (quoting Daddy's Junky Music Stores, 109 F.3d at 283); see Fortres Grand Corp. v. Warner Bros. Entm't, Inc., 763 F.3d 696, 703 (7th Cir. 2014) ("Trademark law protects the source-denoting function of words used in conjunction with goods and services in the marketplace, not the words themselves."). The fact that two marks contain the same word does not necessarily make them similar and/or likely to confuse. See Hornady Mfg. Co. v. Doubletap, Inc., 746 F.3d 995, 1002–03 (10th Cir. 2014) (finding no confusion and stating that "[c]omparing TAP and DoubleTap in visual appearance, they have but one similarity: both carry the word 'tap'"); Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 46 (2d Cir. 2000) (noting that, "in an appropriate case, the 'similarity of the marks' factor can be dispositive and will warrant

13

summary judgment for an infringement defendant," and stating that "DENTYNE ICE and ICE BREAKERS are at best marginally similar because of the common use of 'Ice'"); Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 745 (2d Cir. 1998) (finding that Streetwise and StreetSmart maps were "not confusingly similar" where, among other things, they had different folds, logos, dress colors and typefaces); Jet, Inc., 165 F.3d at 423 ("Jet's infringement claims ultimately fail because JET and AEROB–A–JET simply are not similar enough to cause confusion in the marketplace.").

The Court finds that the marks at issue in this case are not similar and this factor weighs heavily against The Row.

### 4. Evidence of Actual Confusion

The Row has presented no evidence of actual confusion, and argues that such evidence is unnecessary. As support, it quotes the statement in Daddy's Junky Music that, "due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant." 109 F.3d at 284. True enough, but in both Daddy's Junk Music and later cases, the Sixth Circuit has observed that "[e]vidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." Id.; see Groeneveld Transp., 730 F.3d at 517 ("Nothing shows the likelihood of confusion more than the fact of actual confusion.").

The lack of evidence of actual confusion is not fatal, but its presence is certainly helpful. This factor does not help The Row.

### 5. Marketing Channels Used

This factor requires the Court to consider "whether the marketing approaches employed by each party resemble each other." Daddy's Junky Music Stores, 109 F.3d at 285. It appears

14

that both The Row and Rooke use Internet websites and social media platforms, such as Twitter, Facebook, Yelp, Trip Advisor, Open Table, and Four Square, to promote their respective references. As such, this factor weighs in favor of The Row.

### 6. Likely Degree of Purchaser Care

In its response brief, The Row argues:

> The Row mark and the Whiskey Row mark are similar because they share the prominent word "row." Because consumers of restaurant and bar services are likely to exercise a much lesser degree of care than, for example, property owners selecting real estate brokers, the likelihood that those consumers will be confused between Whiskey Row and The Row is considerably greater than a typical buyer exercising ordinary caution. Accordingly, there is a genuine issue of fact for trial making summary judgment inappropriate.

(Doc. No. 50 at 14).

In advancing it argument, The Row wholly fails to address Rooke's argument that – as The Row concedes – Rooke typically uses "Dierks Bentley" on signage and promotional materials. Nor does The Row address Rooke's argument that, even in the Nashville market, it is "highly unlikely that a consumer intending to visit a bar or restaurant would not recognize the stark differences between the two businesses and their respective locations." (Doc. No. 40 at 16). Even if the likely degree of purchaser care presents a factual question, this does not mean that summary judgment is inappropriate. As already noted, "the plaintiff's burden is to identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue." Groeneveld, 730 F.3d at 509. Thus, even if a court "determine[s] from the record that the undisputed factors favor the movant and regard . . . the disputed factors as favoring the non-movant, yet still conclude that the movant prevails on the legal question of confusing similarity, summary judgment [is appropriate]." Abercrombie & Fitch, 280 F.3d at

15

646.

**7. Intent of Defendant**

The Row argues that there is "significant evidence that Rooke intends to use the Whiskey Row mark in a way calculated to divert customers from The Row to Whiskey Row when it opens on Broadway in Nashville," and "[t]his is evident in the progression of changes Rooke has made to the use of the Whiskey Row Mark" by "increasing the size and prominence of the word 'row.'" (Doc. No. 50 at 14). The Row further argues that "'if a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity.'" (Id.) (quoting Daddy's Junky Music Stores, 109 F.3d at 286).

The problem with The Row's argument is that it has not presented a shred of evidence to suggest that Rooke selected its mark in an effort to cause confusion. The evidence is undisputed that Rooke (whether it was forthright with the USPTO, or not) sought and received registration for the Whiskey Row mark more than a year before the Row received its mark, making it extremely unlikely if not impossible for Rooke to have intended to trade off of the goodwill of The Row's non-existent mark. See Lucky's Detroit, LLC v. Double L, Inc., 533 F. App'x 553, 560 (6th Cir. 2013) (finding intent to select factor not met where "Double L offer[ed] no evidence, direct or circumstantial, that LD initially selected the mark to attract Double L's customers"); Little Caesar Ent., Inc. v. Pizza Caesar, Inc., 834 F.2d 568, 572 (6th Cir. 1987) ("[T]here is no evidence that [defendant] even had actual knowledge of the existence of Little Caesar Enterprises, much less that he had any larcenous intent."). This factor weighs against The Row.

**8. Expansion of Product Lines**

Rooke argues this factor is irrelevant because "expansion of product lines means just that – different products, not additional locations." (Doc. No. 53 at 11). Rooke goes on to argue that it "it has not expanded its goods or service line to compete with Plaintiff; it has offered the exact same services as indicated in its trademark application and registration." (Id.). This is too narrow a reading of this factor.

The Sixth Circuit has stated:

> "[A] strong possibility that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." Homeowners Group, Inc., 931 F.2d at 1112. Expansion could be geographic or an increase in products or services.

Gen. Motors Corp. v. Keystone Auto. Indus., Inc., 453 F.3d 351, 357–58 (6th Cir. 2006). With the opening of a restaurant on Broadway, Whiskey Row will have expanded into the Nashville market where The Row's only restaurant is located. This factor favors The Row.

**9. Summary**

Recognizing that the likelihood of confusion is not measured by simply counting the factors for and against such a finding, and that the ultimate question is whether customer and potential customers are likely to be genuinely confused between "The Row" and "Whiskey Row," the Court finds that The Row has failed to present a triable issue of fact "whose resolution would necessarily be dispositive on the likelihood of confusion issue." Groeneveld, 730 F.3d at 509. Even though both marks are used in the restaurant business, the parties utilize the same marketing channels, and they will compete head-to-head in Nashville, other important factors weigh overwhelmingly against the likelihood of confusion. These are: The Row mark, apart from being entitled to protection because it is registered, is not particularly strong; its mark looks

nothing like the Whiskey Row mark; there is no evidence of actual confusion; and there is nothing to suggest that Whiskey Row sought registration in an effort to play off The Row mark.

On summary judgment, "the focus on the 'ultimate question'" of likelihood of confusion "is critical," and "a genuine dispute of material fact on any one of the eight factors does not demonstrate that a grant of summary judgment [i]s improper when there is not enough total evidence for a jury to conclude that the . . . mark is likely to confuse consumers." AutoZone, Inc. 373 F.3d at 793. Such is the case here because a reasonable factfinder could not conclude from the scant evidence presented to the Court that there is a likelihood of confusion between "The Row "and "Whiskey Row" marks. See, Homeowners Grp., Inc. 931 F.2d at 1107 ("To resist summary judgment in a case where the likelihood of confusion is the dispositive issue, a nonmoving party must establish, through pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, that there are genuine factual disputes concerning those of the Frisch's factors which may be material in the context of the specific case."). Accordingly, Rooke is entitled to summary judgment on The Row's trademark infringement claim.

## C. Cancellation

Section 37 of the Lanham Act provides:

> In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director [of the USPTO], who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

15 U.S.C. § 1119. This provision "arms the court with the power to update the federal trademark register to account for a mark's actual legal status (or lack thereof) after it has been adjudicated, thereby reducing the potential for future uncertainty over the rights in a particular mark." Cent.

Mfg., Inc. v. Brett, 492 F.3d 876, 883 (7th Cir. 2007).

"Courts have held that the permissive language of § 1119, providing that the court 'may' determine the right to registration, order cancellation of registrations, and the like, endows the district court with discretionary authority." CFE Racing Prod., Inc., 793 F.3d at 593 (citing Empresa Cubana del Tabaco v. Culbro Corp., 541 F.3d 476, 478 (2d Cir. 2008). Nevertheless, "[a] request for cancellation under § 1119 must be supported by a showing that (1) the party 'has standing to petition for cancellation because it is likely to be damaged,' and (2) 'there are valid grounds for discontinuing registration.'" Id. (quoting Coach House Rest. v. Coach & Six Rests., 934 F.2d 1551, 1557 (11th Cir. 1991)).

Even though The Row has submitted a Declaration in which Kelly Black states that he "believe[s] the Row is likely to be damaged and is being damaged" by the Whiskey Row mark (Doc. No. 48 at 1), his belief, assuming it is competent evidence, is premised upon the idea that the Whiskey Row mark is infringing. Because the Court has found that The Row has failed to submit a triable issue of fact on its trademark infringement claim and that Rooke is entitled to judgment, Mr. Black's beliefs are insufficient to confer standing.

Simply put, section 37 is remedial, Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc., 744 F.3d 595, 599 (9th Cir. 2014); Nike, Inc. v. Already, LLC, 663 F.3d 89, 98 (2d Cir. 2011), and The Row is not entitled to a remedy for trademark infringement. As the Eighth Circuit has observed in an analogous context:

> It may well be that [defendant's] false and fraudulent declaration misled the PTO into registering its trademarks. And it is plausible to suppose that there is some generalized injury that results from the PTO's Register of Trademarks containing marks that it shouldn't contain. But any such injury is not particular to [plaintiff], and cannot support its standing to bring a section 38 suit. . . . To paraphrase the Supreme Court, "although a suitor may derive great comfort and joy from the fact

19

that the [Patent and Trademark Office] is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 107, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

E. Iowa Plastics, Inc. v. PI, Inc., 832 F.3d 899, 903–04 (8th Cir. 2016).[3]

## IV. Conclusion

On the basis of the foregoing, Rooke's Motion for Summary Judgment (Doc. No. 39) will be granted, and The Row's claim for trademark infringement and request for cancellation will be dismissed.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[3] In its response brief, The Row states that "[t]he right to cancel the registration of a trademark is governed by 15 U.S.C. §1064[.]" (Doc. No. 50 at 17). That statutory provision, however, relates to proceedings before the USPTO and does not provide jurisdiction in federal court. See Windsurfing Int'l Inc. v. AMF Inc., 828 F.2d 755, 758 (Fed. Cir. 1987) (Stating that § 1064 "does authorize persons interested in using marks that have become the common descriptive names of articles to petition the Patent and Trademark Office to cancel registration of those marks. It does not however, authorize suits for cancellation in district courts."); Fenwick v. Dukhman, 2015 WL 1307382, at *8 (D.N.J. Mar. 20, 2015) (collecting cases for the proposition that "it is beyond argument that § 1064 applies only to trademark cancellation proceedings in the Patent and Trademark Office" and stating that "the Court's power to cancel trademarks derives solely from 15 U.S.C. § 1119").